IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

    v.

APPROXIMATELY 8,671,456,050 IN
IRAQI DINARS;
APPROXIMATELY 13,317,698,200 IN
VIETNAMESE DONGS;
APPROXIMATELY 2,100 IN
AFGHANIS;
APPROXIMATELY 100 IN CHINESE
YUAN;
APPROXIMATELY 1,600,000 IN
INDONESIAN RUPIAHS;
APPROXIMATELY 29 SILVER COINS;
APPROXIMATELY 14,396,403 IN IRAQI
DINARS;
APPROXIMATELY 20,000 IN
VIETNAMESE DONGS;
APPROXIMATELY 150,000 IN BANK
OF MOZAMBIQUE NOTES;
APPROXIMATELY 23,200 IN BANK OF
EGYPT NOTES;
APPROXIMATELY 1,000 IN UNION OF
BURMA BANK NOTES;
APPROXIMATELY 1,000,000 IN
REPUBLIC OF IRAN BANK NOTES;
APPROXIMATELY 9,799 IN CHINESE
YUAN;
APPROXIMATELY 1,502,600 IN
AFGHANIS;
APPROXIMATELY 2,450 IN BANK OF
SURINAME NOTES;

Civil Action No.

1:15-CV-

1

APPROXIMATELY 9,300 IN BANK OF
YUGOSLAVIA NOTES;
APPROXIMATELY 155,000 IN
CAMBODIAN BANK NOTES;
APPROXIMATELY 500 IN BRAZILIAN
CURRENCY;
APPROXIMATELY 1,000 IN BANK OF
SUDAN NOTES;
APPROXIMATELY 182 GOLD COINS;
APPROXIMATELY 49 SILVER COINS;
APPROXIMATELY $48,718.00 IN
UNITED STATES CURRENCY;
APPROXIMATELY $1,826,973.89
SEIZED FROM BANK ACCOUNT
XXXX001-75;
APPROXIMATELY $200,000.00 SEIZED
FROM BANK ACCOUNT XXXX01-76;
APPROXIMATELY $45,183.75 SEIZED
FROM BANK ACCOUNT XXXX01-99;
APPROXIMATELY $6,321.47 SEIZED
FROM BANK ACCOUNT XXXX02-75;
APPROXIMATELY $105,193.25 SEIZED
FROM BANK ACCOUNT XXXX02-76;
APPROXIMATELY $42,848.25 SEIZED
FROM BANK ACCOUNT XXXX02-99;
APPROXIMATELY $5,953,182.45
SEIZED FROM BANK ACCOUNT
XXX-XX113-9;
APPROXIMATELY $5,941,436.00
SEIZED FROM BANK ACCOUNT
XXX-X9613;
APPROXIMATELY $760,456.50 SEIZED
FROM BANK ACCOUNT
XXXXXX8418;
APPROXIMATELY $174,774.29 SEIZED
FROM BANK ACCOUNT XXX-X0471;
APPROXIMATELY $155,872.08 SEIZED

2

FROM BANK ACCOUNT XXX-X0478;
APPROXIMATELY $155,632.14 SEIZED
FROM BANK ACCOUNT XXX-X0479;
APPROXIMATELY $156,016.05 SEIZED
FROM BANK ACCOUNT XXX-X0480;
APPROXIMATELY $3.34 SEIZED
FROM BANK ACCOUNT XXX-X0488;
APPROXIMATELY $100,002.56 SEIZED
FROM BANK ACCOUNT XXX-X1015;
APPROXIMATELY $2,480,140.95
SEIZED FROM BANK ACCOUNT
XXX-X2048;
APPROXIMATELY $308,423.79 SEIZED
FROM BANK ACCOUNT XXX-X2049;
APPROXIMATELY $146,683.66 SEIZED
FROM BANK ACCOUNT XXX-X2050;
APPROXIMATELY $141,030.48 SEIZED
FROM BANK ACCOUNT XXX-X2062;
APPROXIMATELY $912,058.77 SEIZED
FROM BANK ACCOUNT XXX-X2065;
APPROXIMATELY $4,276,752.09
SEIZED FROM BANK ACCOUNT
XXX-X2066;
APPROXIMATELY $548,084.32 SEIZED
FROM BANK ACCOUNT XXX-X2072;
APPROXIMATELY $4,708,955.32
SEIZED FROM BANK ACCOUNT
XXX-X2087;
APPROXIMATELY $233,502.69 SEIZED
FROM BANK ACCOUNT XXX-X2089;
APPROXIMATELY $217,292.68 SEIZED
FROM BANK ACCOUNT XXX-X2386;
APPROXIMATELY $5,174,942.68
SEIZED FROM BANK ACCOUNT
XXX-X2391;
APPROXIMATELY $318,546.39 SEIZED
FROM BANK ACCOUNT XXX-X2421;

APPROXIMATELY $13,424.15 SEIZED
FROM BANK ACCOUNT XXX-X2426;
APPROXIMATELY $14,231.03 SEIZED
FROM BANK ACCOUNT
XXXXXX0235;
APPROXIMATELY $25,260.98 SEIZED
FROM BANK ACCOUNT
XXXXXX8724;
APPROXIMATELY $246.85 SEIZED
FROM BANK ACCOUNT
XXXXXXXXX0477;
APPROXIMATELY $66,312.33 SEIZED
FROM BANK ACCOUNT
XXXXXXXXX7073;
APPROXIMATELY $115,774.55 SEIZED
FROM BANK ACCOUNT
XXXXXXXXX7380;
APPROXIMATELY $2,873,324.89
SEIZED FROM BANK ACCOUNT
XXX-XX3551;
APPROXIMATELY $508,431.62 SEIZED
FROM BANK ACCOUNT XXX-XX5715;
APPROXIMATELY $3,106,534.41
SEIZED FROM BANK ACCOUNT
XXX-XX5720;
APPROXIMATELY $8.21 SEIZED
FROM BANK ACCOUNT XXX-XX7569;
APPROXIMATELY $72.61 SEIZED
FROM BANK ACCOUNT
XXXXX-X184-2;
APPROXIMATELY $104,336.14 SEIZED
FROM BANK ACCOUNT XXX-X327-2;
APPROXIMATELY $1,041,448.99
SEIZED FROM BANK ACCOUNT
XXXX4008;
APPROXIMATELY $3,043,242.98
SEIZED FROM BANK ACCOUNT

4

XXXX8860;
APPROXIMATELY $3,000.00 SEIZED
FROM BANK ACCOUNT
XXXXXX0124;
APPROXIMATELY $36,200.72 SEIZED
FROM BANK ACCOUNT
XXXXXX0132;
APPROXIMATELY $30,843.89 SEIZED
FROM BANK ACCOUNT
XXXXXX0165;
APPROXIMATELY $126.02 SEIZED
FROM BANK ACCOUNT
XXXXXX0199;
APPROXIMATELY $94,635.98 SEIZED
FROM BANK ACCOUNT
XXXXXX0223;
APPROXIMATELY $9,787.45 SEIZED
FROM BANK ACCOUNT
XXXXXX0231;
APPROXIMATELY $1,297.77 SEIZED
FROM BANK ACCOUNT
XXXXXX0280;
APPROXIMATELY $13,961.39 SEIZED
FROM BANK ACCOUNT
XXXXXX0298;
APPROXIMATELY $293,814.26 SEIZED
FROM BANK ACCOUNT
XXXXXX0371;
APPROXIMATELY $9,940.00 SEIZED
FROM BANK ACCOUNT
XXXXXX0397;
APPROXIMATELY $37,878.22 SEIZED
FROM BANK ACCOUNT
XXXXXX0496;
APPROXIMATELY $22,797.65 SEIZED
FROM BANK ACCOUNT
XXXXXX0579;

APPROXIMATELY $37,015.37 SEIZED
FROM BANK ACCOUNT
XXXXXX2673;
APPROXIMATELY $99,970.00 SEIZED
FROM BANK ACCOUNT
XXXXXX2681;
APPROXIMATELY $201,572.39 SEIZED
FROM BANK ACCOUNT
XXXXXX2821;
APPROXIMATELY $178,791.99 SEIZED
FROM BANK ACCOUNT
XXXXXX2839;
APPROXIMATELY $85,038.93 SEIZED
FROM BANK ACCOUNT
XXXXXX2850;
APPROXIMATELY $122,487.52 SEIZED
FROM BANK ACCOUNT
XXXXXXXXX3245;
APPROXIMATELY $38,036.83 SEIZED
FROM BANK ACCOUNT
XXXXXX3808;
APPROXIMATELY $1,597,831.09
SEIZED FROM BANK ACCOUNT
XXXXXX4675;
APPROXIMATELY $77,676.58 SEIZED
FROM BANK ACCOUNT
XXXXXX4767;
APPROXIMATELY $50,048.42 SEIZED
FROM BANK ACCOUNT
XXXXXX5133;
APPROXIMATELY $1,201,546.95
SEIZED FROM BANK ACCOUNT
XXXXXX5439;
APPROXIMATELY $21,461.39 SEIZED
FROM BANK ACCOUNT
XXXXXX5536;
APPROXIMATELY $114,187.52 SEIZED

FROM BANK ACCOUNT XXXXXX5551;
APPROXIMATELY $43,132.68 SEIZED FROM BANK ACCOUNT XXXXXX6320;
APPROXIMATELY $1,611.81 SEIZED FROM BANK ACCOUNT XXXX-6797;
APPROXIMATELY $158,010.36 SEIZED FROM BANK ACCOUNT XXXXXX7400;
APPROXIMATELY $8,796.58 SEIZED FROM BANK ACCOUNT XXXX-7939;
APPROXIMATELY $139,577.61 SEIZED FROM BANK ACCOUNT XXXXXX8032;
APPROXIMATELY $79,896.51 SEIZED FROM BANK ACCOUNT XXXXXX8575;
APPROXIMATELY $16,882.82 SEIZED FROM BANK ACCOUNT XXXXXX8594;
APPROXIMATELY $61,854.65 SEIZED FROM BANK ACCOUNT XXXXXX8658;
APPROXIMATELY $39,597.41 SEIZED FROM BANK ACCOUNT XXXXXX8674; AND
APPROXIMATELY $44,405.30 SEIZED FROM BANK ACCOUNT XXXXXX9969.

## VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW, the United States of America, the Plaintiff in this matter, by

John A. Horn, Acting United States Attorney the Northern District of Georgia,

and Thomas J. Krepp, Assistant United States Attorney, and files this Complaint for Forfeiture. In support thereof, the United States shows the following:

## I. Introduction

1. This Complaint seeks forfeiture of the below-listed properties to the United States as proceeds of specified unlawful activities and properties involved in money laundering offenses of Sterling Currency Group, LLC ("Sterling"); Sterling Online Processing Services, LLC (Sterling Online); GID Partners, LLC (GID); Alex Capital Holdings LLC (Alex); James Shaw (J.Shaw); Carole Laurette Shaw (C.Shaw); Tyson Rhame (Rhame); Frank Bell (Bell), and other entities controlled by these same businesses and individuals that have used the facilities of interstate commerce in a scheme to defraud investors in the Iraqi dinar by publishing and disseminating false information about the viability of that currency as an investment:

    a.  A total of approximately 8,671,456,050 in Iraqi dinars seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

    b.  A total of approximately 13,317,698,200 in Vietnamese Dongs seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

    c.  A total of approximately 2,100 in Afghanis seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

    d.  A total of approximately 100 in Chinese Yuans seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

e. A total of approximately 1,600,000 in Indonesian Rupiahs seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

f. Approximately 29 silver coins seized from 2751 Buford Highway, #403, Atlanta, Georgia on June 3, 2015;

g. A total of approximately 14,396,403 in Iraqi dinars seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

h. A total of approximately 20,000 in Vietnamese Dongs seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

i. A total of approximately 150,000 in Bank of Mozambique notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

j. A total of approximately 23,200 in Bank of Egypt notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

k. A total of approximately 1,000 in Union of Burma bank notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

l. A total of approximately 1,000,000 in Republic of Iran bank notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

m. A total of approximately 9,799 in Chinese Yuans seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

n. A total of approximately 1,502,600 in Afghanis seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

o. A total of approximately 2,450 in Bank of Suriname notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

p. A total of approximately 9,300 in Bank of Yugoslavia notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

q. A total of approximately 155,000 in Cambodian Bank notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

r. A total of approximately 500 in Brazilian currency seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

s. A total of approximately 1,000 in Bank of Sudan notes seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

t. Approximately 182 gold coins seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

u.  Approximately 49 silver coins seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

v.  Approximately $48,718.00 in United States currency seized from 4536 East Brookhaven Drive, Atlanta, Georgia on June 3, 2015;

w.  Funds in the below listed amounts seized from the following accounts:

| Amount/ Value Seized | Bank Name | Account #[1] | Held in the Name of | Authorized Signatories | Date Opened | Referenced hereinafter as |
|---|---|---|---|---|---|---|
| $1,826,973.89 | Actors Federal Credit Union | XXXX001-75 | Sterling Currency Group | Tyson Rhame James Shaw Frank Bell | 10/10/2013 | ACT #1-75 |
| $200,000.00 | Actors Federal Credit Union | XXXX01-76 | Sterling Currency Group | Tyson Rhame James Shaw Frank Bell | 10/10/2013 | ACT #1-76 |
| $45,183.75 | Actors Federal Credit Union | XXXX01-99 | Sterling Currency Group | Tyson Rhame James Shaw Frank Bell | 10/10/2013 | ACT #1-99 |
| $6,321.47 | Actors Federal Credit Union | XXXX02-75 | Sterling Currency Group | Tyson Rhame James Shaw Frank Bell | 10/10/2013 | ACT #2-75 |
| $105,193.25 | Actors Federal Credit Union | XXXX02-76 | Sterling Currency Group | Tyson Rhame James Shaw Frank Bell | 10/10/2013 | ACT #2-76 |
| $42,848.25 | Actors Federal Credit Union | XXXX02-99 | Sterling Currency Group | Tyson Rhame James Shaw Frank Bell | 10/10/2013 | ACT #2-99 |
| $5,953,182.45 | Goldman Sachs and Co. | XXX-XX113-9 | Spring Lake Trading LLC | James Shaw | 08/18/2014 | GS #113-9 |
| $5,941,436.00 | J.P. Morgan Chase | XXX-X9613 | JS Real Estate Investments LLC | James Shaw | Unknown | JPMC #9613 |
|  |  |  |  |  |  |  |

[1] Although full account numbers and the names of minors and third parties have been redacted to comply with the local rules, the United States will file a Motion seeking the Court's permission to file the above spreadsheet without the redactions under seal so that the record is complete.

| Amount/ Value Seized | Bank Name | Account #[1] | Held in the Name of | Authorized Signatories | Date Opened | Referenced hereinafter as |
|---|---|---|---|---|---|---|
| $760,456.50 | Mahopac National Bank | XXXXXX8418 | Sterling Currency Group | Tyson Rhame Frank Bell | 5/1/2012 | MNB #8418 |
| $174,774.29 | Merrill Lynch | XXX-X0471 | James Shaw | James Shaw Carole Shaw | 4/20/2012 | ML #0471 |
| $155,872.08 | Merrill Lynch | XXX-X0478 | James Shaw custodian for E.S. | James Shaw | 4/20/2012 | ML #0478 |
| $155,632.14 | Merrill Lynch | XXX-X0479 | James Shaw custodian for A.S. | James Shaw | 4/20/2012 | ML #0479 |
| $156,016.05 | Merrill Lynch | XXX-X0480 | James Shaw custodian for C.S. | James Shaw | 4/20/2012 | ML #0480 |
| $3.34 | Merrill Lynch | XXX-X0488 | James & Carole Shaw | James Shaw Carole Shaw | 4/20/2012 | ML #0488 |
| $100,002.56 | Merrill Lynch | XXX-X1015 | Tyson Rhame | Tyson Rhame | 01/01/2014 | ML #1015 |
| $2,480,140.95 | Merrill Lynch | XXX-X2048 | Curtis Creek Holdings, LLC | James Shaw | 4/24/2012 | ML #2048 |
| $308,423.79 | Merrill Lynch | XXX-X2049 | Alex Capital Holdings, LLC | Tyson Rhame James Shaw | 4/24/2012 | ML #2049 |
| $146,683.66 | Merrill Lynch | XXX-X2050 | JS Real Estate Investments, LLC | James Shaw | 4/24/2012 | ML #2050 |
| $141,030.48 | Merrill Lynch | XXX-X2062 | Lullwater Holdings, LLC | Tyson Rhame | 5/6/2012 | ML #2062 |
| $912,058.77 | Merrill Lynch | XXX-X2065 | Curtis Creek Holdings, LLC | James Shaw | 6/27/2012 | ML #2065 |
| $4,276,752.09 | Merrill Lynch | XXX-X2066 | Curtis Creek Holdings, LLC | James Shaw | 6/27/2012 | ML #2066 |
| $548,084.32 | Merrill Lynch | XXX-X2072 | Curtis Creek Holdings, LLC | James Shaw | 6/27/2012 | ML #2072 |
| $4,708,955.32 | Merrill Lynch | XXX-X2087 | Curtis Creek Holdings, LLC | James Shaw | 6/26/2012 | ML #2087 |
| $233,502.69 | Merrill Lynch | XXX-X2089 | Curtis Creek Holdings, LLC | James Shaw | 6/26/2012 | ML #2089 |
| $217,292.68 | Merrill Lynch | XXX-X2386 | SR Equipment Leasing, LLC | James Shaw Tyson Rhame | 12/5/2013 | ML #2386 |
| $5,174,942.68 | Merrill Lynch | XXX-X2391 | Primestone Properties, LLC | James Shaw | 7/1/2014 | ML #2391 |

| Amount/ Value Seized | Bank Name | Account #[1] | Held in the Name of | Authorized Signatories | Date Opened | Referenced hereinafter as |
|---|---|---|---|---|---|---|
| $318,546.39 | Merrill Lynch | XXX-X2421 | Springlake Trading, LLC | James Shaw | 8/12/2014 | ML #2421 |
| $13,424.15 | Merrill Lynch | XXX-X2426 | SR Equipment Leasing LLC | Tyson Rhame James Shaw | 11/29/2014 | ML #2426 |
| $14,231.03 | Regions Bank | XXXXXX0235 | Sterling Online Processing Services, LLC | Frank Bell | 3/17/2011 | REG #0235 |
| $25,260.98 | Regions Bank | XXXXXX8724 | Sterling Online Processing Services, LLC | Frank Bell | 5/26/2011 | REG #8724 |
| $246.85 | SunTrust Bank | XXXXXXXXX0477 | Alys Beach Account | James Shaw Carole Shaw | 8/11/2014 | ST #0477 |
| $66,312.33 | SunTrust Bank | XXXXXXXXX7073 | Carole Shaw | Carole Shaw | 5/1/2013 | ST #7073 |
| $115,774.55 | SunTrust Bank | XXXXXXXXX7380 | James or Carole Shaw | James Shaw Carole Shaw | 3/28/2012 | ST #7380 |
| $2,873,324.89 | TD Ameritrade | XXX-XX3551 | Lullwater Holdings, LLC | Tyson Rhame | 11/1/2014 | TDA #3551 |
| $508,431.62 | TD Ameritrade | XXX-XX5715 | Lullwater Holdings, LLC | Tyson Rhame | 9/1/2012 | TDA #5715 |
| $3,106,534.41 | TD Ameritrade | XXX-XX5720 | The TAR Revocable Trust | Tyson Rhame | 09/01/2012 | TDA #5720 |
| $8.21 | TD Ameritrade | XXX-XX7569 | Lullwater Holdings, LLC | Tyson Rhame | 10/1/2011 | TDA #7569 |
| $72.61 | USAA Federal Savings Bank | XXXXX-X184-2 | Tyson Rhame | Tyson Rhame | 09/15/2011 | USAA #1842 |
| $104,336.14 | USAA Federal Savings Bank | XXX-X327-2 | Tyson Rhame | Tyson Rhame | 4/2/1997 | USAA #3272 |
| $1,041,448.99 | Wedbush Morgan Securities Inc. | XXXX4008 | Broadway Trader 4Z, LLC | James Shaw | 03/18/2015 | WED #4008 |
| $3,043,242.98 | Wedbush Morgan Securities Inc. | XXXX8860 | Springlake Trading, LLC | James Shaw | 08/05/2014 | WED #8860 |
| $3,000.00 | Wells Fargo | XXXXXX0124 | Scotch Cove, LLC | Tyson Rhame | 3/14/2014 | WF #0124 |
| $36,200.72 | Wells Fargo | XXXXXX0132 | RG Classics, LLC | Tyson Rhame REDACTED | 3/19/2014 | WF #0132 |
| $30,843.89 | Wells Fargo | XXXXXX0165 | Isolveit.com, LLC | Tyson Rhame Frank Bell | 5/8/2014 | WF #0165 |
| $126.02 | Wells Fargo | XXXXXX0199 | Sterlingfunder, LLC | Tyson Rhame James Shaw REDACTED | 2/11/2014 | WF #0199 |
|  |  |  |  |  |  |  |

13

| Amount/ Value Seized | Bank Name | Account #[1] | Held in the Name of | Authorized Signatories | Date Opened | Referenced hereinafter as |
|---|---|---|---|---|---|---|
| $94,635.98 | Wells Fargo | XXXXXX0223 | Sherrills Ford Holdings, LLC | Tyson Rhame | 3/8/2014 | **WF #0223** |
| $9,787.45 | Wells Fargo | XXXXXX0231 | Alex Capital Holdings, LLC | Tyson Rhame James Shaw | 9/12/2012 | **WF #0231** |
| $1,297.77 | Wells Fargo | XXXXXX0280 | Trinvest Partners, LLC | Tyson Rhame | 12/11/2012 | **WF #0280** |
| $13,961.39 | Wells Fargo | XXXXXX0298 | Sky Combat Blue, LLC | Tyson Rhame | 1/3/2013 | **WF #0298** |
| $293,814.26 | Wells Fargo | XXXXXX0371 | TR East Point Real Estate, LLC | Tyson Rhame | 8/28/2013 | **WF #0371** |
| $9,940.00 | Wells Fargo | XXXXXX0397 | TR Interactive Technologies, LLC | Tyson Rhame | 10/21/2013 | **WF #0397** |
| $37,878.22 | Wells Fargo | XXXXXX0496 | Polaris Aviation, LLC | Tyson Rhame | 10/25/2012 | **WF #0496** |
| $22,797.65 | Wells Fargo | XXXXXX0579 | Sky Combat Red, LLC | Tyson Rhame | 12/12/2012 | **WF #0579** |
| $37,015.37 | Wells Fargo | XXXXXX2673 | Cascades at Rea, LLC | Tyson Rhame | 7/10/2014 | **WF #2673** |
| $99,970.00 | Wells Fargo | XXXXXX2681 | Arrowhead Station Holdings, LLC | Tyson Rhame | 9/11/2014 | **WF #2681** |
| $201,572.39 | Wells Fargo | XXXXXX2821 | Sterling Online Processing Services | Frank Bell | 11/15/2011 | **WF #2821** |
| $178,791.99 | Wells Fargo | XXXXXX2839 | Sterling Online Processing Services | Frank Bell | 11/15/2011 | **WF #2839** |
| $85,038.93 | Wells Fargo | XXXXXX2850 | Tyson Rhame | Tyson Rhame | 3/14/2012 | **WF #2850** |
| $122,487.52 | Wells Fargo | XXXXXXXXXX3245 | Miracle Charters, LLC | Tyson Rhame REDACTED | Unknown | **WF #3245** |
| $38,036.83 | Wells Fargo | XXXXXX3808 | GID Partners, LLC | Frank Bell | 10/8/2013 | **WF #3808** |
| $1,597,831.09 | Wells Fargo | XXXXXX4675 | Tyson Rhame | Tyson Rhame | 03/15/2012 | **WF #4675** |
| $77,676.58 | Wells Fargo | XXXXXX4767 | Primestone Properties, LLC | James Shaw REDACTED | 4/30/2014 | **WF #4767** |
| $50,048.42 | Wells Fargo | XXXXXX5133 | TR Real Estate, LLC | Tyson Rhame | 2/29/2012 | **WF #5133** |
| $1,201,546.95 | Wells Fargo | XXXXXX5439 | Lullwater Holdings, LLC | Tyson Rhame | 10/25/2011 | **WF #5439** |

| Amount/ Value Seized | Bank Name | Account #[1] | Held in the Name of | Authorized Signatories | Date Opened | Referenced hereinafter as |
|---|---|---|---|---|---|---|
| $21,461.39 | Wells Fargo | XXXXXX5536 | Sterling Online Processing Services | Frank Bell | 3/26/2014 | WF #5536 |
| $114,187.52 | Wells Fargo | XXXXXX5551 | Whistlejacket, Inc. | Frank Bell | 3/26/2014 | WF #5551 |
| $43,132.68 | Wells Fargo | XXXXXX6320 | J-Brem, LLC | Frank Bell | 8/14/2012 | WF #6320 |
| $1,611.81 | Wells Fargo Advisors | XXXX-6797 | Tyson Rhame | Tyson Rhame | 06/28/2012 | WF #6797 |
| $158,010.36 | Wells Fargo | XXXXXX7400 | Therrell Farms Estates, LLC | Tyson Rhame | 9/23/2014 | WF #7400 |
| $8,796.58 | Wells Fargo Advisors | XXXX-7939 | Lullwater Holdings, LLC | Tyson Rhame | 6/28/2012 | WF #7939 |
| $139,577.61 | Wells Fargo | XXXXXX8032 | Lullwater Holdings, LLC | Tyson Rhame | 10/25/2011 | WF #8032 |
| $79,896.51 | Wells Fargo | XXXXXX8575 | GID Partners, LLC | Frank Bell | 10/8/2013 | WF #8575 |
| $16,882.82 | Wells Fargo | XXXXXX8594 | Frank Bell | Frank Bell | 3/26/2014 | WF #8594 |
| $61,854.65 | Wells Fargo | XXXXXX8658 | Trinvest, LLC | Tyson Rhame | 10/27/2014 | WF #8658 |
| $39,597.41 | Wells Fargo | XXXXXX8674 | Zonolite Holdings, LLC | Tyson Rhame | 10/23/2014 | WF #8674 |
| $44,405.30 | Wells Fargo | XXXXXX9969 | Sustainability Solutions, LLC | Tyson Rhame | 5/21/2014 | WF #9969 |

(collectively the Defendant Properties).

2. Based on the evidence described below, the Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) as proceeds of specified unlawful activity traceable directly and indirectly to violations of 18 U.S.C. §§ 1341, 1343, 1349, 1956, and 1957.

3. Additionally, the Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957.

4.  This Court has jurisdiction over this action and the claims raised herein by virtue of 28 U.S.C. §§ 1345 and 1355(a).

5. Venue is proper in the Northern District of Georgia because those properties are located and remain herein. *See* 28 U.S.C. §§ 1395(a) and (b).

6. Additionally, venue is proper in the Northern District of Georgia as to all of the Defendant Properties because acts in furtherance of the conspiracies and substantive offenses alleged above occurred herein and because the offenses subjecting that property are properly chargeable in the Northern District of Georgia. *See* 28 U.S.C. §§ 1355 (b) and 1395(a) and (b).

## II. Facts Giving Rise to Forfeiture

### A. The Business of Sterling Currency Group

7. Since at least 2004, Sterling Currency Group, LLC ("Sterling"), an Atlanta, Georgia-based business that also does business under the name Dinar Banker, has become one of the largest sellers of Iraqi dinar in the United States.  While Sterling also offers the sale of what its website calls "other exotic currencies," including the Vietnamese Dong, Indonesian Rupiah, Afghani, and Chinese Yuan, the bulk of Sterling's business comes from the sale of the Iraqi dinar.

8. Sterling is one of several money service businesses in the United States that purchases the Iraqi dinar abroad for sale to customers in the United States and Canada.

9. Sterling purchases its inventory of dinar notes from exchangers in the Middle East, transports the notes in bulk to the United States via commercial carrier, retrieves the notes from Hartsfield Jackson International Airport, and trucks them for storage to a business location in Atlanta, Georgia, where they remain available to fill customer orders placed on its websites (initially at www.dinarbanker.com and now at www.sterlingcurrencygroup.com) and over the telephone.

10. Sterling operates in partnership with Sterling Online Processing ("Sterling Online"), which provides administrative services for Sterling, as well as GID Partners ("GID Partners"), which is an Iraqi dinar exchanger purchased by Sterling.

11. Tyson Rhame (Rhame) and James Shaw (J.Shaw) are the co-owners and co-founders of Sterling. Rhame and Shaw share ownership of Sterling through their respective interests in several corporations, including Alex Capital Holdings ("Alex"), Lullwater Holdings ("Lullwater"), and Curtis Creek Holdings ("Curtis Creek") as well as the trusts "Valley Trust" and "Lullwater Trust."

12. Carol Laurette Shaw (C.Shaw) is married to J.Shaw and is also a co-owner of Sterling through her interests in Alex, Curtis Creek, and Valley Trust. As recently as 2011, C.Shaw played an active role in Sterling's operations.

13. Frank Bell (Bell) began working for Sterling in 2010 and is presently Sterling's Chief Operating Officer (COO). Bell presently runs the day-to-day affairs of Sterling.

14. Since at least 2010, Rhame, J.Shaw, C.Shaw, and Bell have shared control of Sterling's operations.

## B.  Knowledge of the Scam

15.  Sterling's success is at least partially attributable to its use of the facilities of interstate commerce, including wire communications, both directly and indirectly, to disseminate false and misleading information about the possibility of a revaluation of the dinar and to steer customers toward choosing Sterling over its competitors.

16. The revaluation (or simply, "RV") theory has spread throughout the Internet and is promoted by a variety of internet blogs and individuals who hold themselves out to be currency experts or "dinar gurus."  According to the RV theory, the dinar will experience an abrupt, exponential rise in value against the U.S. dollar and hence yield enormous profits for dinar holders.

17. An individual who worked for Sterling from approximately 2013 to 2015 confirmed that Bell at one point told customer service center representatives in a meeting that there would never be an Iraqi dinar revaluation.  Bell instructed the representatives not to tell callers that the revaluation will never occur but to tell the callers to do their own research.

18. Email communications between Rhame, J.Shaw, C.Shaw, and Bell confirm that these individuals know that the concept of the dinar revaluation is a scam.

a. For instance, C.Shaw sent an October 20, 2010, email to Rhame that stated, in part, "I cant [sic] watch these folks be so stupid" and then stated "3 orders all for 100,000 at 200 each and 1 order for 10 notes at 330 shipping overnight each at 43.00 and to the same address."

b. On November 3, 2010, J.Shaw sent an email to Rhame entitled, "Discussion Point," an email that he also forwarded to C.Shaw, which read, in part:

Ty,

The point of my call was not to talk about net worth. We have a business that I valued at $8-10 million in that formula (SCG). Laurette and I do not think about how much is hers and mine as you do in your relationship (like I should give her 99% of profits). We are 50-50 partners on everything and if we ever split up we would divide all assets as such. She has lately been very nervous and was crying last night because she knows we are running an illegal operation.

The point is that her [sic] and I have worked way too hard in life for us to risk everything based on your belief (even if I agree with you) that the Iraqi dinar will not RV and it is ok to make millions of dollars in false promises to our customers. Not only are we risking everything we own, we are risking serious jail time as promoters of a ponzi scheme. . .

Jim

19. A series of emails sent on November 30, 2010, further shows knowledge and intent.

a. On that date, Rhame sent an email to J. Shaw that J.Shaw then forwarded to C.Shaw, which read in part, "Our business is chicken shit and we got CRUSHED in a conference call on Sunday night---not because of anything said against us, but because we operate small minded and haven't been growing. We are not a real company.  I got beat up in a conference call again last night because of our limited growth."

b. J.Shaw's response to Rhame, one that he forwarded to C.Shaw, stated, in part, "Laurettes [sic] job is just as important as yours. I am sick of seeing her work most days and nights just to have you pretend to be doing so much more than anyone." The email also stated, "I am not sure how much bigger this business needs to be until it can be managed properly. We are at risk for lawsuits and other problems. We are not selling Coca Cola."

c. On that same date, another email from J.Shaw to Rhame, one that J.Shaw ultimately forwarded to C.Shaw more than a year later on December 20, 2011, read as follows:

Ty,

The more I think of your bullshit emails the more it disgusts me. I bankrolled this entire business at its inception by putting up 80% of initial capital (500/630). Throw in Zurich and I bankrolled 95% of all finances. Laurette has done at least 50% of the work and I was instrumental in our website and getting the business

growing. Our agreement was that you and Laurette would work the business. How much work has Bonnie done? AS SOON AS THE BUSINESS STARTS TO DO REALLY WELL, YOU START THROWING OUT YOUR CONTROL FREAK EMAILS.

FYI: Laurette and I are concerned about getting letters to you thanking you for helping them with their hospital with their purchase of $20k for a $200k layaway and other similar letters. We are not Charlatans and I do not like making money under false pretenses. I DONOT WANT TO BE ALI. Our life is happy without swindling people."

20. Additionally, a March 22, 2011, set of emails further shows that Rhame and C.Shaw were aware of Sterling's wrongdoing.

    a.  Specifically, on that date, Rhame sent C.Shaw an email that copied J.Shaw with the subject, "Comments related to AMENDED Operating Agreement" in which he asserted, "This amendment is complete bullshit written for the purpose of obtaining banking. Jim and Ty are operation [sic] under the original partnership agreement. We are 50% partners and his ass will go to prison if mine does."

    b.  Thereafter, C.Shaw replied, "and won't your asses have an interesting time there. NOT."

21. Likewise, on August 6, 2012, J.Shaw sent Bell an email with the subject line, "not great article," that contained a hyperlink to a news article entitled, "You Can't Fix Stupid – The Iraqi Dinar Scam Lives."

## C. Sterling's Unlawful Business Practices

22. Sterling's unlawful business practices fall into at least two categories.  First, Sterling unlawfully used at least one revaluation promoter to disseminate false information and steer prospective dinar purchasers toward Sterling.  Second, Sterling used telephone conversations and its own web site to make false representations and false promises to its customers.

### i. Sterling's Use of the RV Promoters' Web Sites

23. Sterling has knowingly benefitted from false representations made by web sites and blogs, including "The GET Team."

24. The GET Team, which is led by an individual known as TerryK, runs an internet chat room and weekly conference calls in which information about the Iraqi dinar is discussed.  During those chats and conferences, TerryK spreads false information suggesting that the revaluation is about to occur.

25. In a September 13, 2010, email, TerryK introduced himself to Rhame:

> Ty, My name is TerryK, I own the worlds [sic] largest Dinar web site going….we have currently 7200 members and currently we hold two calls a week with about 1500 on the call and 100's if not 1,000's on skype listening in…what I would like to do is open a discussion with you and maybe have you on a call this coming wed night.  It starts at 9pm and thought maybe 10-15 min on how you operate, how to cash in with your firm and then a question and answers session….let me know via email [sic].
>
> terryk.

26. Thereafter, beginning at least as early as 2011, Sterling began making monthly payments in the amount of $4,000 to TerryK. In total, Sterling has paid TerryK more than $150,000 since 2011.

27. Since TerryK's 2010 email, Sterling employees, including Bell and Rhame, have routinely spoken on the GET Team's weekly conference calls. For example, on the May 27, 2015, GET Team conference call, Bell stated that Sterling would be offering a "fire sale" in early June 2015. During this conference call, TerryK stated that listeners should purchase currency from Sterling, that he trusted his friends "Ty" and "Frank" at Sterling, and that he had so much trust in Bell that he would be comfortable giving Bell his bank account information.

28. In the GET Team chat room and during the weekly conference calls, TerryK also passed along false information purportedly received from sources about the revaluation of the Iraqi dinar and other currencies (such as the Vietnamese dong).

   a. For example, on the January 8, 2014, conference call, TerryK stated that a source at Wells Fargo said that it would take at most 10 to 15 minutes to process the exchange of Iraqi dinar.

   b. Additionally, on the March 12, 2014, conference call, TerryK stated that a source at Wells Fargo had told him "it" was supposed to happen but that the time kept changing.

   c. Likewise, on the April 16, 2014, conference call, TerryK said that he had heard from the "UST," a reference to the U.S. Department

23

of Treasury, that the rate was good and that everything would be
released that week.

29. On June 3, 2015, TerryK acknowledged during an interview with the Federal
Bureau of Investigation (FBI) that he had fabricated source information on GET
Team online postings and conference calls.

30. In fact, the U.S. Department of Treasury is not preparing and has never
prepared for an Iraqi dinar revaluation.

31. Similarly, Wells Fargo does not trade in the Iraqi dinar and also warns its
customers not to invest in it.  In fact, a publicly available Well Fargo Advisors
Memorandum dated March 10, 2014, states that Wells Fargo is not preparing for an
Iraqi dinar revaluation and has no plans whatsoever to exchange the Iraqi dinar.

32. Moreover, a November 7, 2011, email exchange between TerryK, Rhame and
Bell confirms that TerryK and Sterling have sought to keep the specific nature of
their relationship secret.

   a. On that date, TerryK sent an email to Rhame and Bell that read:
      "I want to make sure that our arrangement is between us and no
      one else...As no one else needs to know about our arrangement...
      Please confirm...
      Thanks for all you guys do... [sic]"

   b. Bell's reply, sent that same day, read, "Absolutely noone [sic] but
      us [sic]."

33. Although on May 28, 2015, Bell represented to the FBI during an interview that Sterling maintains a "firewall" between itself and revaluation promoters, email records belie his assertions.

    a. For instance, on May 2, 2012, TerryK sent an email to Bell that read as follows:

> You should have gotten a lot of business on the reserves the past week, been pushing it hard on the site bro.....make sure TY is not selling dinar from the middle table that one is mine.....[sic]"

> Bell's reply, sent the following day, read, "TK, Will do, thanks for your support."

    b. Likewise, on March 11, 2013, TerryK sent Bell an email that read,

> FYI Received payment today, thanks for following up..What else can I do to help sales for your team? Just let me know buddy, I will be in the room later today to get some things moving as well [sic].

    c. Also, on July 22, 2013, TerryK sent Bell an email reading as follows:

> Frank, please find attached the banner invoice for the month of August 2013, I trust things are going well, as we keep promoting the heck out of Sterling.. [sic] If there is anything you need let me know.

34. On June 3, 2015, Bell acknowledged to FBI agents that Sterling should not have continued to do business with the dinar promoters.

## ii. False Representations and Promises on Sterling's Website

35. Sterling's business practices have included publishing information on its own website that its principals knew to be untrue and disseminating false information over the telephone.

36. For instance, though Sterling's website now warns customers that "Sterling Currency Group / DinarBanker is not an accredited financial consultant" and "that the value of the currency may go down or go up depending on circumstances beyond our control," in 2010, Sterling, used its former website, www.dinarbanker.com, to suggest that a revaluation could occur in the near future.

37. Furthermore, on of December 27, 2010, Sterling's website displayed an article titled "Iraqi Dinar Revaluation" that cited Tyson Rhame as its primary source and that stated, in part:[2]

> To put it simply, the Iraqi Dinar is currently worth less than 1/10th of a US penny (Approximately $1000 US dollars buys 1 million Iraqi Dinar). Historically, the Iraqi Dinar has been worth over 3 US dollars for every Iraqi Dinar (Over $3,000,000 US dollars purchased 1 million Iraqi Dinar). Put another way, 1 million Iraqi Dinar is currently worth a little less that 1000 US dollars and historically 1 million Iraqi Dinar has been worth well over $3,000,000.00 US dollars. So, the question is: **Will the Iraqi Dinar increase in value? And if so, how? And when?**
>
> * * * *
>
> The bottom line is that the Iraqi Dinar is currently at an extremely low valuation compared to the US Dollar. The currency has

---

[2] All emphases are in the original material.

steadily increased in value since inception in late 2003. **Iraq is a country with phenomenal wealth potential; and additionally, has the backing and support of the major political and economic powers of the world.** There currently seems to be minimal risk that the Iraqi Dinar will decrease in value. The tremendous potential upside return compared to the minimal downside risk seems to make the Iraqi Dinar a compelling investment opportunity worth investigating.

\* \* \*

**In determining when the Iraqi Dinar will increase in value, all indicators point toward something happening in the near future (next 12 months) if not the very near future (next 3 months).** The appreciation of the Iraqi Dinar has been unprecedentedly flat over the past 8 months despite low Iraqi inflation and a weakening US economy and US dollar. The Iraqi economy has been on a continual surge of economic growth for the past couple of years as Iraq has continued to stabilize and rebuild. The news coming out of Iraq from numerous returning military members with various reliable sources indicates a rapid move and increase in valuation occurring prior to, or in conjunction with US troop reductions. Indicators also point to an increase in the Iraqi Dinar exchange rate occurring prior to, or shortly after Iraqi elections. It appears that administratively, the IMF, WTO, and other world financial entities are working in close conjunction with the Iraqi Government to bring Iraq's financial system online with the rest of the world. The expectation is that the Iraqi Dinar will soon be freely traded through banks worldwide---further accelerating their recovery and economy, and adding to overall stability.

\* \* \*

To answer the question of 'How' and 'How high?' the Iraqi Dinar will revaluate, some speculation is in order. Based on historical precedents, an initial sudden significantly (overnight/over weekend) high revaluation seems very possible. **This initial move could be anywhere along the entire spectrum of rumored possibilities from $.01 to $1.49. After this initial revaluation, it**

**seems likely there will be numerous significant incremental increases in valuation over a period of time.** This continual increase in value after an initial base valuation will prevent an overwhelming surge on the world financial system. By incrementally increasing the value of the dinar, it will limit the number and amount of Iraqi Dinar exchanges as many investors and currency traders will choose to hold their Iraqi Dinar or purchase more as they anticipate further valuation increases. In other words, a steady increase in the value of the Iraqi Dinar will create a free flowing market as some investors cash-out, others hold on, and others purchase Iraqi Dinar for the first time.

38. In contrast, since that time, Bell has told FBI agents that he believes that the Iraqi dinar will never revalue. In a May 28, 2015, interview with the FBI, Bell explained that based upon his education and experience with international finance, he believes that the Iraqi dinar will never be revalued to the extent that dinar promoters commonly claim. Furthermore, in a June 3, 2015, interview with the FBI, Bell used the term "mythology" when discussing the concept of an Iraqi dinar revaluation.

39. In 2010, Sterling's website also represented that following the revaluation, customers would be able to exchange their Iraqi dinars at kiosks or "remote satellite offices" located at airports around the country.

40. Postings to Sterling's website are illustrative.

 a. For instance as of January 3, 2010, Sterling's website displayed an article titled, "Complete Guide To Exchanging Iraqi Dinar After Revaluation" that stated, in part,

> **Dinar Banker has the ability to set up secure remote satellite offices at numerous airport locations nationwide within 24 hours. They have a long history of transporting and securing currency all over the world through their global operations and are prepared for any exchange needs.**[3]

b.  Similarly, as of October 21, 2010, Sterling's website displayed an article titled, "Iraqi Dinar Exchange Locations" that stated, in part:

> DinarBanker will have secure remote satellite offices set up at numerous airport locations nationwide as soon as possible in the event of a revaluation. You will not have to go through security in the airport exchange locations – You can simply come in with Dinar in a briefcase or luggage and come to the exchange location set up in the office area of each airport. We will have de la Rue machines to quickly count and verify your Dinar and all equipment needed to perform fast and secure wire transfers.

c.  That same article then represented that the "Current Exchange Locations" that Sterling planned "in the Event of an RV include[d]:"

**City, State - Airport Code**
Atlanta, GA - ATL
Boston, MA - BOS
Chicago, IL - ORD
Cincinnati, OH - CVG
Dallas / Fort Worth, TX - DFW
Denver, CO - DEN
Detroit, MI - DTW

---

[3] Emphasis in original.

Houston, TX - IAH
Las Vegas, NV - LAS
Los Angeles, CA - LAX
Miami, FL - MIA
Minneapolis, MN - MSP
New Orleans, LA - MSY
New York, NY - JFK
Phoenix, AZ - PHX
Salt Lake City, UT - SLC
San Francisco, CA - SFO
Seattle, WA - SEA
St. Louis, MO - STL
Tampa, FL - TPA
Washington, DC - DCA (Ronald Reagan)
Washington, DC - IAD (Dulles)

**International Locations**
Calgary, Canada - YYC
Vancouver, Canada - CYVR
Toronto, Canada - CYXZ
San Juan, Puerto Rico

41. In 2010, Rhame told a Sterling customer over the telephone that Sterling would open a kiosk at John F. Kennedy International Airport in New York following the revaluation to exchange Iraqi dinars for U.S. dollars.

42. Despite these representations, a former Sterling employee has confirmed that Sterling never had any arrangements with airports to operate remote satellite offices or kiosks. Furthermore, representatives from three of the above-listed airports have confirmed that Sterling never had arrangements to operate remote satellite offices or kiosks.

### III. The Money Laundering Scheme

43. Sterling's customers pay for their purchases via eChecks, wire transfers, cashier's checks, official bank checks, certified checks, money orders, and Collect on Delivery, and Sterling ships the dinar notes to the purchaser in interstate commerce.

44. Sterling's revenues have been considerable, for since 2004, Sterling has earned over $600 million in gross sales or receipts.

    a.   Between 2004 and 2011, Sterling reported the following gross receipts:

| Year | Gross receipts |
|------|----------------|
| 2004 | $4,932,065 |
| 2005 | $4,827,368 |
| 2006 | $1,061,127 |
| 2007 | $4,899,750 |
| 2008 | $18,105,972 |
| 2009 | $13,506,661 |
| 2010 | $25,932,324 |
| 2011 | $245,411,774 |

    b.   In 2012 and 2013, when Alex, Sterling's parent entity, reported Sterling's revenues, gross receipts reached the following totals:

| Year | Gross receipts |
|------|----------------|
| 2012 | $126,465,731 |
| 2013 | $109,169,253 |

    c.   Sterling's gross revenues between January and September 2014 totaled approximately $85,602,807.

31

45. As described below, once Sterling received payments from its customers, it, Sterling Online, GID, Alex, Lullwater, Lullwater Trust, Curtis Creek, Valley Trust, Rhame, J.Shaw, C.Shaw, and Bell engaged in financial and monetary transactions in tainted funds that diffused proceeds of the fraud scheme throughout a complex network of accounts held in the names of a myriad of trusts and business entities in addition to individuals, often in amounts of more than $10,000, with intent to promote the unlawful fraud scheme and for the purpose of concealing and disguising the nature, source, location, ownership, and control of those proceeds.

46. In addition to the accounts referenced in paragraph 1(w), the below-listed accounts were also used in furtherance of the money laundering scheme:

| Bank Name | Account # | Held in the Name of | Authorized Signatories | Date Opened | Referenced hereinafter as |
|---|---|---|---|---|---|
| Bank of America | XXXXXXXX3681 | Web Stormz, LLC | Redacted | 11/4/2011 | BOA #3681 |
| Bank of America | XXXXXXXX4406 | Web Stormz, LLC | Redacted | 5/28/2014 | BOA #4406 |

47. The following chart describes the ownership interests between Alex, Sterling, Sterling Online, GID, Curtis Creek, Lullwater, Lullwater Trust, and Valley Trust:

| Company | Partners | Percentage | Incorporation State |
|---|---|---|---|
| Alex Capital Holdings, LLC | Curtis Creek Holdings, LLC | 50% | Delaware |
| | Lullwater Holdings, LLC | 50% | |
| | | | |
| Sterling Currency Group, LLC | Alex Capital Holdings, LLC | 100% | Georgia |
| | | | |

32

| Sterling Online Processing Services, LLC | Curtis Creek Holdings, LLC | 50% | Georgia |
|---|---|---|---|
| | Lullwater Holdings, LLC | 50% | |
| | | | |
| GID Partners, LLC | Alex Capital Holdings, LLC | 100% | Georgia |
| Curtis Creek Holdings, LLC | JS, LS, Valley Trust | | South Dakota |
| Lullwater Holdings, LLC | TR, Lullwater Trust | | South Dakota |

48. Rhame controls Lullwater directly and through Lullwater Trust. Similarly, J.Shaw and C.Shaw own Curtis Creek directly and through Valley Trust. Finally, Bell manages the daily affairs of the Sterling entities as the Chief Operating Officer and through his company, Whistlejacket.

## A. Seized Bank Accounts

49. On June 3, 2015, federal agents executed seizure warrants issued by the United States District Court for the Northern District of Georgia and seized the accounts listed in paragraph 1(w).

50. Sterling has used at least nine known bank accounts to receive currency purchase money from investors.

51. As detailed in Exhibits A, B, C, D, and E to this Complaint, proceeds from sales of currency to consumers were received in the nine accounts listed below, and gross deposits into each account during the range specified appear below:

| Date Range | Account | |
|---|---|---|
| 02/01/2011 to 05/11/2011 | FTB #9640 | $ 26,005,096.82 |
| 07/26/2011 to 11/18/2011 | GCB #5361 | $ 13,704,389.63 |
| 07/19/2011 to 11/18/2011 | GCB #5379 | $ 51,876,456.67 |
| 11/16/2011 to 11/01/2013 | WF #2821 | $ 20,436,714.53 |
| 11/11/2013 to 10/31/2014 | ACT #2-74 | $ 3,162,078.82 |
| 11/05/2013 to 10/31/2014 | ACT #1-74 | $ 69,831,589.87 |
| 01/02/2014 to 11/28/2014 | CHEL #5493 | $ 4,098,617.38 |
| 02/26/2014 to 11/28/2014 | CHEL #9734 | $ 28,915,707.06 |
| 01/02/2014 to 02/28/2014 | CHEL #0592 | $ 4,757,490.52 |
| | **TOTAL** | **$222,788,141.30** |

52. Thereafter, as shown in exhibits A-K, tainted funds flowed from, through, and into the accounts listed in paragraph 1(w), a significant number of which were held in names other than Sterling.

53. The purposes behind some of those financial transactions included remitting proceeds to conspirators, facilitating the operation of the underlying scheme, and concealing and disguising the nature, source, location, ownership, and control of fraud proceeds.

54. Additionally, by moving the tainted funds out of receiving accounts and into "downstream" accounts, conspirators engaged in unlawful monetary transactions involving more than $10,000 in tainted funds.

55. The bank accounts listed in paragraph 1(w) are forfeitable as proceeds traceable directly and indirectly to schemes and artifices to defraud and properties involved in money laundering offenses.

34

### B.  Assets Seized on June 3, 2015

56. On June 3, 2015, federal agents seized the following items from Sterling's business premises, located at 2751 Buford Highway NE, #207, Atlanta, GA 30324 (as listed in paragraph 1(a)–(f)):

      a.  Approximately 8,671,456,050 in Iraqi dinars;

      b.  Approximately 13,317,698,200 in Vietnamese Dongs;

      c.  Approximately 2,100 in Afghanis;

      d.  Approximately 100 in Chinese Yuans;

      e.  Approximately 1,600,000 in Indonesian Rupiahs; and

      f.  Approximately 29 silver coins.

57. On June 3, 2015, federal agents seized the following items from 4536 E. Brookhaven Drive, Atlanta, Georgia 30319 (as listed in paragraph 1(g)-(v)):

      a.  Approximately 14,396,403 in Iraqi dinars;

      b.  Approximately 20,000 in Vietnamese Dongs;

      c.  Approximately 150,000 in Bank of Mozambique notes;

      d.  Approximately 23,200 in Bank of Egypt notes;

      e.  Approximately 1,000 in Union of Burma bank notes;

      f.  Approximately 1,000,000 in Republic of Iran bank notes;

      g.  Approximately 9,799 in Chinese Yuans;

      h.  Approximately 1,502,600 in Afghanis;

      i.  Approximately 2,450 in Bank of Suriname notes;

j.   Approximately 9,300 in Bank of Yugoslavia notes;

k.   Approximately 155,000 in Cambodian Bank notes;

l.   Approximately 500 in Brazilian currency;

m.  Approximately 1,000 in Bank of Sudan notes;

n.   Approximately 182 gold coins;

o.   Approximately 49 silver coins; and

p.   Approximately $48,718.00 in United States currency.

58. The Defendant Properties listed in paragraph 1(a) through (v) are also forfeitable as proceeds traceable directly and indirectly to schemes and artifices to defraud and properties involved in money laundering offenses.

## IV. Conclusion

59. For all of these reasons, the United States is entitled to forfeiture of the Defendant Properties as proceeds traceable directly and indirectly to schemes and artifices to defraud and properties involved in money laundering offenses.

WHEREFORE, the United States prays:

That the Court forfeit the Defendant Properties to the United States of America;

That the Court award the Plaintiff the costs of this action; and

That the Court grant such other relief as the Court deems just and proper.

Respectfully submitted this 29th day of July, 2015.


Respectfully submitted,

JOHN A. HORN
   *Acting United States Attorney*
   *600 U.S. Courthouse*
   *75 Spring Street SW*
   *Atlanta, GA 30303*
   *(404) 581-6000   fax (404) 581-6181*


/s/THOMAS J. KREPP
   *Assistant United States Attorney*
   Georgia Bar No. 346781


37

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

    v.

APPROXIMATELY 8,671,456,050 IN
IRAQI DINARS, *ET AL.*,

        DEFENDANTS.

Civil Action No.

1:15-CV-

## VERIFICATION

I, W. Scott Baucom, of the Federal Bureau of Investigation, have read the Verified Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief based upon my personal knowledge of the case and upon information obtained from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 29th day of July, 2015.

/s/ W. Scott Baucom
W. Scott Baucom
Special Agent
Federal Bureau of Investigation

38